485 A.2d 30

**Jean RITTEL**

v.

**Frank RITTEL, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 9, 1983.

Filed Nov. 23, 1984.

Joseph J. Yeager, Wilkes-Barre, for appellant.

Lawrence D. MacDonald, Wilkes-Barre, for appellee.

Before SPAETH, President Judge, and CAVANAUGH and HOFFMAN, JJ.

SPAETH, President Judge:

This appeal is from an order entered on a petition that appellant be held in contempt for failing to comply with a child support order. The trial court did not hold appellant in contempt but ordered that part of the proceeds due appellant from the sale of entireties property be used to satisfy appellant's arrearages, and further, that the remainder of the proceeds be put into an escrow account to guarantee future payments on the support order. Appellant argues that in entering the order the trial court abused its discretion because, among other reasons, the court did not consider appellant's ability to pay support and the change in appellant's circumstances. We agree, and therefore remand for further proceedings consistent with this opinion.

The support order from which this appeal arises was issued on October 8, 1980, on the basis of an agreement by the parties. The order provided that appellant should pay $140 bi-weekly to appellee for the support of their two minor children, $10 bi-weekly on arrears due appellee, and $5 bi-weekly on arrears due the Department of Public Welfare. According to the testimony of a Miss Iorio, given at the contempt hearing, the terms of the order were based on appellant's sole source of income of $227 per week in workman's compensation benefits. (Transcript at 1)[1]

On December 30, 1980, appellant claims, his benefits were discontinued after an insurance company doctor found him

---

1. Miss Iorio is not identified in the transcript. From the context of her remarks, however, she appears to be an officer of the court.

to be physically capable of returning to his job as a truck driver. This claim was supported by Miss Iorio, who testified that she had received an affidavit from the P.M.A. Insurance Company to the effect that appellant's benefits had been discontinued on December 30, 1980. (Transcript at 1) Appellant asserted that he still was unable to work, and indicated that a report from a Doctor Groblewski would show this. (Transcript at 6) However, neither the insurance company affidavit nor the doctor's report is part of the record.

Appellant did not file a petition to modify the support order after his benefits were discontinued. At no time during the course of the proceedings against him, in fact, has appellant challenged the amount of support he was required to pay under the October 8 support order. Instead, in January 1980, he simply stopped paying all child support. (Testimony of Miss Iorio, Transcript at 1)

On May 7, 1981, appellee petitioned the trial court to hold appellant in contempt for non-payment of support. On October 1, 1981, the court scheduled a hearing on the petition and so notified appellant.[2]

The contempt hearing was held on November 20, 1981. Appellee's attorney was present, as was the Commonwealth's attorney representing the Department of Public Welfare. Appellant was unrepresented. At several times during the course of the hearing, appellant referred to his absent attorney.[3] Early in the hearing, when questioned by the trial court regarding the resources he had available to

---

**2.** The notice informed appellant of his right to defend against the claim that he had willfully disobeyed the support order, but it did not suggest that he seek legal advice. *Compare* Pa.R.C.P. No. 1910.21, which states that a petition for civil contempt in a support matter "shall begin with a notice in substantially the following form," and prescribes a form that ends:

> YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**3.** The attorney thus identified has filed a brief in support of appellant's appeal. While arguing that appellant had "an absolute right to have legal counsel present", Brief for Appellant at 6, the brief does not offer an explanation of the attorney's absence.

satisfy the substantial arrearages that had accumulated since January 1980, appellant noted that appellee had placed a $5,000 lien upon their jointly-owned home. The following colloquy ensued:

THE COURT: How do you know it's [the lien is] there?

MR. RITTEL: It's in the courthouse. My attorney knows about it.

THE COURT: Who is your lawyer?

MR. RITTEL: Joseph Yeager.

THE COURT: Where is he today?

MR. RITTEL: I don't know sir.

(Transcript at 2)

Later in the hearing, when questioned further about his ability to pay the arrearages, appellant again referred to his attorney:

THE COURT: What do you want to do about the arrearage, sir?

MR. RITTEL: I would pay it but my home is up for sale.

THE COURT: Pardon.

MR. RITTEL: My attorney knows everything but my home is sold.

(Transcript at 3)

Appellant again mentioned information possessed by his attorney when the court continued to question him regarding the arrearages:

THE COURT: What are you able to pay on that arrearage right now?

MR. RITTEL: I am disabled.

THE COURT: Can you pay half of it?

MR. RITTEL: I don't have nothing. They took my workmen's compensation off me December 31, 1980. The company doctor says I'm better, Mr. Yeager knows I'm disabled. There's a record there from Doctor Groblewski.

(Transcript at 5–6)

These several references to appellant's attorney, and to what the attorney knew, were not pursued by the trial

court. Instead the court apparently concluded,[4] on the basis of its questioning of appellant, that the only resource available to appellant to satisfy the arrearages was the home he owned jointly with his wife as tenants by the entireties.

Appellee's attorney then informed the court that "[w]e"— not identifying to whom he referred—had tentatively agreed that appellant should assign a sufficient share of the proceeds from the sale of the parties' home to pay the arrearages in full. (Transcript at 6) Appellee's attorney further informed the court that "[t]he prospects" of the home being sold were "relatively good". (Transcript at 6) The attorney explained that the sale depended upon receipt of an "appraisal of the home at $40,000.00 to substantiate the mortgage." *Id.* Further questioning of appellee's attorney by the court revealed that the property was encumbered by a mortgage of $9,000, a Department of Public Welfare lien of $4,000, and a bank lien of $1,000 to secure a loan to appellee. (Transcript at 4–5) Thus the court was informed, in substance though not in so many words, that if the home were sold, the net proceeds would be about $25,000 so that appellant's share would be about $12,500.

At this point in the hearing appellee's attorney expressed his client's concern "about future payments". (Transcript at 6) The court then questioned appellant:

THE COURT: ... Are you willing to accept an order directing that the amount of any arrearage at the time of closing shall be paid directly to the mother of the children ...

MR. MacDONALD [appellee's attorney]: Well, it would be paid to ...

THE COURT: ... and as far as guarantee any future payments. Are you willing to place your share of the ...

MR. RITTEL: My children, I'll give anything to my children, anything.

4. We say "apparently" because the court has not written an opinion explaining its order. We believe, however, that the court's conclusion is implicit in its order.

THE COURT: Wonderful. Then I'm going to ask you to place your balance of the money from the sale of the home in escrow so you can pay from there the weekly support.

MR. RITTEL: I love you, I love everybody according to law. I'm a human being and I'm a good human being, I'll pay it.

THE COURT: Are you agreeable to that order?

MR. RITTEL: Yes.

(Transcript at 7–8)

After some further colloquy the court issued the following order:

THE COURT: Upon the sale of the home there shall be deducted from the defendant's [appellant's] half share and made payable from the proceeds directly by bank check the amount thus due on arrearages for support of the two children.

Further, after that arrearage is paid in full the balance due the defendant from his share shall be placed in escrow with directions to the escrow agent to submit weekly checks—bi-weekly checks in the amount of $140.00, that would then be the net effective order because all arrearages would have been resolved.

(Transcript at 11)

It is this order from which appellant has appealed.

■ Appellant does not object to that part of the trial court's order directing that appellant's arrearages be paid from appellant's share of the proceeds from the sale of the parties' home; his objection is to that part of the order directing that the remaining part of his share of the proceeds be placed in escrow to guarantee future payments of child support. He argues that the issue of future support payments was not properly before the court. He further argues, apparently in the alternative, that if the issue was properly before the court, then in deciding it the court abused its discretion because it failed to take into considera-

tion appellant's circumstances and consequent ability to pay support as directed in the order.[5]

In considering appellant's arguments, we must bear in mind that the scope of our review of a support order is narrow: "absent a clear abuse of discretion, we will defer to the order ..." *Commonwealth ex rel. Scanlon v. Scanlon,* 311 Pa.Super. 32, 38, 457 A.2d 98, 101 (1983). *See also Commonwealth v. Vogelsong,* 311 Pa.Super. 507, 457 A.2d 1297 (1983). However, before entering a child support order the trial court "should consider the parent's income and the full nature and extent of the parent's property interests and financial resources." *Pawol v. Pawol,* 293 Pa.Super. 29, 34, 437 A.2d 974, 977 (1981) (quoting *Commonwealth ex rel. Hagerty v. Eyster,* 286 Pa.Super. 562, 429 A.2d 665 (1981)), and we will remand where the record demonstrates that the trial court did not consider these factors, or where the record fails to disclose that the court did consider them. *Id.; Commonwealth ex rel. Rosenfeld v. Rosenfeld,* 276 Pa.Super. 616, 419 A.2d 628 (1980) (remand where after reviewing record we were "unable to determine whether appellant was afforded a full and fair opportunity to air [his] claims ...."). *See also, Commonwealth v. Vogelsong, supra* (on petition to modify support

5. Appellant makes two other arguments, which may be disposed of summarily.

First, appellant argues that because the trial court was authorized to impose a sentence of up to six months imprisonment for contempt of the support order, *see* 42 Pa.Cons.Stat.Ann. § 6708(b), he had "an absolute right to have legal counsel present at [the contempt] proceeding." Brief for Appellant at 6. Appellant had no such right. The rule articulated in *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), to which appellant refers, is that no indigent criminal defendant may be imprisoned without having been offered court-appointed counsel. In *Scott v. Illinois,* 440 U.S. 367, 373, 99 S.Ct. 1158, 1,161, 59 L.Ed.2d 383 (1979), however, the Court specifically limited *Argersinger* to those cases in which imprisonment is actually imposed, not merely authorized. In the present case, the court did not hold appellant in contempt, and did not order him imprisoned. Even had the court ordered imprisonment, however, the rule of *Argersinger* would not be applicable, for the contempt proceeding against appellant was civil, not criminal. *See Barrett v. Barrett,* 470 Pa. 253, 386 A.2d 616 (1977) (contempt proceedings for non-payment of support are civil, not criminal, because purpose of sanctions imposed is to coerce defendant into paying, not to punish him for non-payment.) Finally, the record does not show that appellant was indigent and therefore unable to secure his own attorney, but only that he had an attorney who did not, for an unexplained reason, appear at the hearing.

Second, appellant argues that the trial court abused its discretion by failing to write an opinion stating its reasons for its decision. Brief for Appellant at 10. Because of our disposition below, we do not reach this argument.

order, all relevant circumstances must be considered); *Prescott v. Prescott*, 284 Pa.Super. 430, 426 A.2d 123 (1981) (on petition to remit arrearages, all factors relevant to appellant's financial condition must be considered); *Commonwealth ex rel. Re David v. Re David*, 251 Pa.Super. 103, 380 A.2d 398 (1977) (court should consider both spouses' income, potential earning power, and extent of property and financial resources). Here, we have concluded, appellant was not "afforded a full and fair opportunity to air [his] claims." Moreover, so far as we can determine from the record, the trial court did not consider all of the factors relevant to appellant's financial condition. Accordingly, we shall remand for further proceedings.

We may begin our explanation of this conclusion by noting that important economic rights of appellant were determined in the absence of his attorney. As already remarked, the record does not reveal why at the hearing, *see supra* note 3, appellant was unrepresented, and it is certainly true that he had no right to have counsel present, *see supra* note 4. Furthermore, as appellee argues, appellant did agree to the escrow arrangement when it was proposed to him by the court. (Brief for Appellee at 5) However, we are not persuaded that without the opportunity to consult with his attorney, appellant understood what he was "agreeing" to. Moreover, the transcript shows that the court and appellee's attorney knew that appellant was represented and that prior negotiations of some sort regarding the disposition of appellant's property had taken place, and further, that appellant's attorney may have possessed information regarding both the sale of the parties' home and appellant's medical and employment history. Although it was therefore clear that the presence of appellant's attorney would have been helpful to a full and fair adjudication of appellant's ability to satisfy his future support obligations, no effort appears to have been made to call the attorney. (Transcript at 2, 3, 6)

The suggestion arising from these circumstances that an unfair advantage may have been taken of appellant is

strengthened by the fact that appellant was given no notice that appellee would seek a guarantee of his future payments of support. The notice that was given appellant was that he might be held in contempt for his past non-payment of support. (Record at 12) The device of an escrow account to guarantee future payments was first suggested by the trial court, in the middle of the hearing, after the prompting of appellee's attorney. (Transcript at 8, 6)

If we put aside these procedural concerns regarding the absence of appellant's attorney and the failure to give full notice, still we are unable to approve the trial court's order. At the hearing, appellant contended that he was physically unable to work; that he was unemployed; that he was without a current source of income; that he was living with his mother; and that he was borrowing money from her to live. (Transcript at 8–9) While appellant called no witness to support these contentions, neither did appellee's attorney call any to rebut them, and to some extent they were corroborated by Miss Iorio. It is of course true that all of a parent's resources are available to satisfy the parent's child support obligations. *See Dugery v. Dugery,* 276 Pa.Super. 51, 54, 419 A.2d 90, 91 (1980), *citing Commonwealth ex rel. DiVirgilio v. DiVirgilio,* 182 Pa.Super. 475, 480, 127 A.2d 774, 776–777 (1956). Nevertheless, "[i]t is well established in Pennsylvania that any order for support must be fair and not confiscatory. The purpose of such an order is the maintenance and welfare of the children, not the punishment of the parent, and the amount of the order must be justified by the parent's present earning ability, making due allowance for his own reasonable living expenses." *Commonwealth ex rel. Goodman v. Delara,* 219 Pa.Super. 449, 453, 281 A.2d 751, 753 (1971). *See also Costello v. LeNoir,* 462 Pa. 36, 40, 337 A.2d 866, 868 (1975); *Commonwealth ex rel. Malizia v. Malizia,* 229 Pa.Super. 108, 324 A.2d 386 (1974). Thus in *Commonwealth v. Vogelsong, supra,* we held that the trial court had abused its discretion when it refused to modify a support order after the parent had presented evidence that the amount of the order exceeded his only source of income, his

Social Security disability benefits. The trial court had based its refusal to modify on the fact that the parent owned entireties property to which he could look to satisfy his obligations. We ruled, however, that because, among other reasons, the property was the parent's only major asset and because the support order exceeded his current level of income, "to require that it be encumbered further or liquidated for arrearages ... appears unreasonable, if not confiscatory." 457 A.2d at 1301. The same may be said here, if appellant's contentions regarding his ability to work and his financial circumstances are true. Of course, appellant's contentions may not be true. We have no way of knowing. And since no testimony was presented either in support of or against the contentions, neither did the trial court have any way of knowing.

The trial court's order is affirmed in part, regarding the arrearages, and reversed in part, regarding the future payments, and the case is remanded for further proceedings consistent with this opinion. Jurisdiction is relinquished.